# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH CAROLINA

# COLUMBIA DIVISION

| | |
|---|---|
| CHRISTOPHER A. STARKS AND TINA W. STARKS, as the PERSONAL REPRESENTATIVES for the ESTATE OF BRITTANY JASMINE OSWELL,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | CA. NO. 3:18-cv-01062-MGL<br><br>**FIRST AMENDED COMPLAINT**<br>**(Jury Trial Demanded)** |

TO:  TIMOTHY M McKISSOCK, ESQUIRE, ERIN R. STUCKEY, ESQUIRE AND EVAN T. LEADEM, ESQUIRE, ATTORNEYS FOR THE DEFENDANT

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), the Plaintiffs, Christopher A. Starks and Tina W. Starks, as the Personal Representative for the Estate of Brittany Jasmine Oswell, by and through the undersigned counsel, submit this first amended complaint.

The Plaintiffs, complaining of the above named defendant herein, respectfully allege and show unto this Honorable Court as follows:

## JURISDICTIONAL ALLEGATIONS

1. Plaintiffs Christopher A. Starks and Tina W. Starks ("the Personal Representatives") are the duly appointed Personal Representatives for the Estate of their deceased child, Brittany Jasmine Oswell ("Brittany"). Pursuant to S.C. Code Ann. §§ 15-5-90 and 15-51-20, the Personal Representatives bring this action on behalf of the Estate of Brittany Jasmine Oswell and for those damages recoverable by the heirs and statutory beneficiaries of the Decedent. As will appear more fully in the records of the Probate Court for the County of Lexington, South Carolina in

1

case No. 2016-ES-32-00963, Brittany was a citizen of South Carolina at the time of her death. The Plaintiffs are deemed citizens of South Carolina pursuant to 28 U.S.C. § 1332(c)(2).

2. Upon information and belief, the Defendant, American Airlines, Inc., ("American") is a foreign corporation organized in the state of Delaware, with its principal place of business in the state of Texas.

3. American, at all times relevant hereto, was doing business in South Carolina through its agents, employees, subsidiaries and its subsidiaries' agents and employees, and through this persistent course of conduct, American derives substantial revenue from services rendered in this state. Moreover, American is a registered foreign corporation with the South Carolina Secretary of State, and maintains a registered agent for service of process, namely, CT Corporation System of Columbia, South Carolina.

4. Subject matter jurisdiction over this action exists in the federal district court pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy herein exceeds seventy-five thousand ($75,000.00) dollars, exclusive of interest and costs.

5. Both American's registration as a foreign corporation and its conduct of substantial business by itself and through its subsidiaries in this state foreseeably connect it with the forum state of South Carolina, such that American reasonably should anticipate being subjected to the jurisdiction of the Courts of this state. Accordingly, this court has *in personam* jurisdiction over American. Likewise, venue is proper in the Columbia Division of the United States District Court for the District of South Carolina.

## FACTUAL ALLEGATIONS

6. At all times relevant to this action, Cory Kadeem Oswell ("Cory") was the husband of Brittany and was active duty military personnel stationed in Hawaii. Additionally, at all times

relevant to the allegations in this complaint, Cory and Brittany maintained their permanent residency in the City of Columbia, County of Lexington, South Carolina.

7.  On April 14, 2016, at approximately 8:05 p.m. HST, Cory and Brittany boarded American's Flight No. AA102, originating in Honolulu, Hawaii, with a scheduled arrival time at the Dallas-Fort Worth Airport at 8:36 a.m. CST on April 15, 2016. Brittany was assigned seat no. 24J for the duration of the flight, while Cory was assigned seat no. 24H.

8.  Upon information and belief, approximately three (3) hours after departure from Honolulu, while the flight was flying over or near the City of Los Angeles, State of California, Brittany became dizzy and disoriented. Cory paged the flight attendants. Upon information and belief, the responding flight attendants observed Brittany slurring her speech before she suddenly fainted. Upon information and belief, a flight attendant paged the passengers to determine whether a medical doctor was on board who could provide assistance. A doctor was a passenger on the flight, and examined Brittany. By this time, Brittany had regained consciousness and was communicative with the doctor and the flight attendants.

9.  Upon information and belief, the doctor initially believed Brittany was suffering a panic attack, and did not direct oxygen to be administered. As the doctor conducted her examination, Brittany said she felt drowsy and nauseous when seated in an upright position. Brittany proceeded to lay across seat nos. 24H and 24J, while Cory moved to an aisle seat across from her. Meanwhile American's command crew continued the flight to the Dallas-Fort Worth airport.

10. Between one to three hours after Brittany's first incident, while the flight was over or near Albuquerque, New Mexico, Brittany went to the lavatory on the airplane, accompanied by

3

Cory. Upon information and belief, at this time, flight AA102 was approximately ninety (90) minutes to two (2) hours from its scheduled arrival at the Dallas-Fort Worth airport.

11. Shortly after Brittany entered the middle lavatory, Cory alerted the flight attendants that his wife was in distress again. The flight attendants came to the lavatory and observed Brittany lying on the floor. Brittany had vomited and defecated all over herself and the lavatory. While the flight attendants and Cory attempted to render assistance, Brittany projectile vomited on them.

12. The Plaintiffs are informed and believe that the flight attendants again summoned the doctor for help, while a flight attendant grabbed emergency medical supplies, including blood pressure cuffs, oxygen and an automatic external defibrillator ("AED").

13. The Plaintiffs are informed and belief that, upon arriving at the middle lavatory, the doctor directed the flight attendants to inform the flight crew that it needed to divert the plane from its scheduled arrival at Dallas-Fort Worth to the nearest airport, so Brittany could receive proper medical care.

14. The Plaintiffs are informed and believe that the flight attendants moved Brittany to the airplane's galley for further examination, assessment and treatment. The Plaintiffs are further informed and believe that, pursuant to the doctor's instructions, a flight attendant contacted the flight crew in the cockpit and conveyed the doctor's instructions to divert the airplane.

15. The Plaintiffs are informed and believe that, after the flight attendants relocated Brittany to the galley, she began receiving oxygen. The Plaintiffs are further informed and believe that there was still sufficient time for the flight crew to land the airplane at Albuquerque. However, although approximately (30) minutes had elapsed after the flight deck was notified of the requested diversion, upon information and belief, no landing was ever attempted.

4

16. The Plaintiffs are informed and believe that, during the time the doctor and the flight attendants continued their attempts to assist Brittany, she briefly regained consciousness. The Plaintiffs are informed and believe that the doctor attempted to measure Brittany's blood pressure, but one of the cuffs registered an "error" and was unusable, while the pressure ball on the other cuff was broken.

17. The Plaintiffs are informed and believe that approximately thirty (30) minutes after the doctor initially requested the flight crew divert the plane for an emergency landing, the captain apparently had awakened from sleep and summoned the doctor to the flight deck. Upon information and belief, the doctor arrived in the cockpit and reported Brittany's symptoms to the physician on call for American. However, despite the first-hand observations of the seriousness of Brittany's conditions by the medical doctor who treated her and who had requested the flight diversion, the Plaintiffs are informed and believe that the captain elected to continue the flight to Dallas-Fort Worth airport after conferring with the land based physician on call. Upon information and belief, the flight was approximately ninety (90) minutes from landing at that time.

18. The Plaintiffs are informed and believe that the flight attendants continued to monitor Brittany while the doctor was in the cockpit. The Plaintiffs are informed and believe that the doctor conveyed the flight crew's decision after she returned from the cockpit. The doctor continued attending Brittany while the flight was in progress. The Plaintiffs are informed and believe that, approximately five (5) minutes after the doctor returned to the galley, Brittany stopped breathing and her pulse stopped.

19. The Plaintiffs are informed and believe that, after Brittany's pulse stopped, the doctor and the flight attendants placed the AED pads on Brittany's chest, and attempted to turn on the

current. However, upon information and belief, the AED reported that no shock was administered despite three (3) attempts. The Plaintiffs are informed and believe that the doctor and the flight attendants then took turns administering cardiopulmonary resuscitation to Brittany, while using the AED intermittently to detect a pulse. Additionally, the Plaintiffs are informed and believe that the doctor gave Brittany a shot of epinephrine from the emergency medical kit.

20. Upon information and belief, while the doctors and the flight attendants continued to provide assistance to Brittany in the galley, the flight crew again contacted the physician on call approximately forty-five (45) minutes before landing at the Dallas-Fort Worth airport. Upon further information and belief, the flight crew decided to continue on the flight plan after the second consultation with the land based physician on call.

21. Brittany never regained consciousness on the flight or thereafter. The Plaintiffs are informed and believe that the flight attendants and the doctor continued their efforts to administer cardiopulmonary resuscitation until arrival at the Dallas-Fort Worth airport sometime before 8:40 a.m. on April 15, 2016. At that time, emergency medical services personnel met the flight at the airport runway and took over the care of Brittany.

22. Upon information and belief, the emergency medical services personnel initially diagnosed Brittany as suffering from cardiac arrest, possibly related to a pulmonary embolism. The emergency medical services personnel intubated Brittany, but could not locate a pulse until the third attempt at 8:40 a.m. The emergency medical services transported Brittany to Baylor Medical Center.

23. Brittany was admitted to Baylor Medical Center's intensive care unit, where the physicians ordered a CT scan. The CT scan of Brittany's head revealed the presence of diffuse cerebral edema with loss of gray/white matter differentiation and sulcal effacement.

Additionally, the staff at Baylor Medical Center diagnosed Brittany with anoxic brain damage and an acute embolism.

24. Brittany remained unresponsive and unconscious at Baylor Medical Center, where she remained on total life support for three (3) days while she was in the facility's care. On April 16, 2016, the pulmonologist at Baylor said Brittany had suffered cardiac arrest, a secondary massive pulmonary embolism, and that she was approaching brain death. The pulmonary embolism also caused Brittany to suffer acute respiratory failure.

25. Brittany's condition worsened on April 17, 2016, as the cerebral edema appeared to progress. Very minimal cerebral activity was seen, which was consistent with generalized encephalopathy.

26. On April 18, 2016, the attending doctor diagnosed Brittany with no brain activity. After removing Brittany from artificial ventilation and life support, the attending doctor declared Brittany dead at 5:18 p.m. The cause of death was stated as acute massive pulmonary embolism and cardiogenic shock. At the time of death, Brittany was only twenty-five (25) years old.

### FOR A FIRST CAUSE OF ACTION
**(Negligence/Gross Negligence Resulting in Wrongful Death)**

27. Each and every allegation set forth above is fully incorporated herein.

28. Upon information and belief, at all times relevant to this complaint, American was certified to operate as a Federal Aviation Administration air common carrier.

29. As an air common carrier, American owed its passengers the highest duty of care.

30. At all times relevant to the allegations in this Complaint, the flight crew, all flight attendants and the ground crew were acting within the scope and course of their employment with American.

31. Through the doctrine of *respondeat superior*, American is vicariously liable for the negligent acts and omissions of the employees which comprised its command flight crew for Flight AA102.

32. American, through the conduct and omissions of its flight crew, was negligent, grossly negligent, negligent *per se*, careless, willful, wanton and reckless in its conduct toward Brittany, in the following particulars:

   a)  In refusing to divert the plane from its scheduled flight plan for an immediate emergency landing, as requested and repeatedly urged by a medical doctor on board the flight.  That doctor was in the best position to observe Brittany, to appreciate the seriousness of Brittany's symptoms, and to recommend the appropriate and required course of action when it was readily apparent that Brittany could not receive the necessary medical care while she remained on the flight.  Such failure to timely divert the flight and make an emergency landing denied Brittany the ability and opportunity to receive proper medical care in a timely manner, resulting in her death.

   b)  In failing to conform their conduct to the standard of care required of flight crew personnel when presented with a passenger demonstrating Brittany's symptoms.  Brittany's signs of distress should have informed the crew that her condition required an immediate emergency landing, regardless of any request by a doctor on the flight.

   c)  In failing to comply with one or more regulations, statutes, directives or other applicable authority which govern passenger safety and in-flight emergencies involving passengers.

   d)  In such additional particulars of negligence, gross negligence, negligence *per se*, recklessness, carelessness and willful and wanton conduct which may be shown by the evidence developed through discovery and adduced at a trial of this matter.

The foregoing acts and omissions, either singularly or in combination, were the direct and proximate cause of Brittany's wrongful death.

33. American's conduct was negligent, grossly negligent, negligent *per se*, reckless, careless, willful and wanton in its conduct toward Brittany in the following particulars:

a)  In failing to develop policies and procedures for its flight crew to follow in the case of a medical emergency involving passengers which required an immediate diversion from the flight plan and emergency landing, or if such policies and procedures were in place, in failing to file such policies and procedures.

b)  In failing to train its flight crew in complying with the required policies and procedures to be followed in the case of a medical emergency involving passengers which required an immediate diversion from the flight plan and emergency landing.

c)  In failing to supervise its flight crew to ensure their compliance with the required policies and procedures to be followed in the case of a medical emergency involving passengers which required an immediate diversion from the flight plan and emergency landing.

d)  In failing to provide competent, trained, experienced and knowledgeable medical staff capable of evaluating the condition of passengers who experienced an in flight medical emergency and recommending the appropriate course of action for the flight crew to follow under the circumstances.

e)  In failing to provide proper working equipment and medical supplies to enable the appropriate treatment required to sustain a passenger who experiences an in flight medical emergency until proper treatment can be obtained from and provided by medical facilities and personnel on the ground.

f)  In failing to comply with one or more regulations, statutes, directives or other applicable authority which govern passenger safety and in-flight emergencies involving passengers.

g)  In such additional particulars of negligence, gross negligence, negligence *per se*, recklessness, carelessness and willful and wanton conduct which may be shown by the evidence developed through discovery and adduced at a trial of this matter.

The foregoing acts and omissions, either singularly or in combination, were the direct and proximate cause of Brittany's wrongful death, resulting in damages to her statutory beneficiaries and heirs.

34. As a direct and proximate result of American's negligence, gross negligence, negligence *per se*, recklessness, carelessness and willful and wanton conduct, Brittany's statutory beneficiaries and heirs, as represented by the Personal Representatives, have suffered economic loss including but not limited lost earning capacity, severe emotional distress, anxiety, grief, and sorrow, for which Brittany's estate is entitled to recover on behalf of the statutory beneficiaries actual and punitive damages (when allowable under law) pursuant to S.C. Code §§ 15-51-10 *et seq.*, in an amount to be determined by the jury.

**FOR A SECOND CAUSE OF ACTION**
**(Survivorship Action)**

35. Each and every allegation set forth above is fully incorporated herein.

36. American, acting through its agents and employees, as well as those who might be revealed through discovery, committed various acts and omissions as previously outlined above, which constitute negligence, gross-negligence, negligence *per se*, carelessness, recklessness and willfulness and wantonness.

37. As a direct and proximate result of the acts and/or omissions of American as listed above, Brittany sustained severe injuries which led to her death.

38. The Personal Representatives are informed and believe that, pursuant to S.C. Code § 15-5-90, the Estate is entitled to a judgment against American for the damages which Brittany would be entitled to had she survived, both actual and punitive, for the intense pain and suffering she consciously experienced before her death.

WHEREFORE, the Plaintiffs in this action pray for judgment against the Defendant:

(1) for actual and punitive damages in an amount to be determined by a jury,

(2) for the costs of this action, including reasonable attorney fees as allowed by law, and

(3) for such other relief as the Court may deem just and proper.

    Respectfully submitted,

    s/Bradford W. Cranshaw
    Bradford W. Cranshaw (Fed. Bar #9733)
    **GRIER, COX & CRANSHAW, LLC**
    2999 Sunset Blvd, Suite 200
    West Columbia, SC  29169
    Phone: 803-731-0030
    Fax: 803-731-4059

    s/Matthew M. McGuire
    Matthew M. McGuire (Fed. Bar #8051)
    **ERVIN & McGUIRE LAW FIRM, LLC**
    1824 Bull Street
    Columbia, SC 29201
    Phone: 803-708-8471
    Fax:  803-708-4771

    **ATTORNEYS FOR THE PLAINTIFFS**

June 1, 2018

Columbia, South Carolina